**FIRST AMERICAN DEVELOPMENT GROUP/CARIB, LLC.,**
**Plaintiff/Counterclaim Defendant**

v.

**WESTLB AG, individually and as administrative agent for itself and other co-lenders, Defendant/Counterclaim Plaintiff**

v.

**STONE MASONRY, INC., WILLIAM R. NASH, V.I., INC., SPRINGLINE ARCHITECTS, LLC, BIOIMPACT, INC., DEBRA GRAMMER d/b/a ST. JOHN CABINETS AND INTERIORS, MLC HOLDINGS, LLC d/b/a IMPORT SUPPLY, ASCF INTERNATIONAL, LLC, ALRICK S. PARIS d/b/a PARIS DUMP TRUCK SERVICES, WHARTON-SMITH, INC., MO STEEL FABRICATORS & ERECTORS INC., MICHAEL J. LANAHAN LUMBER COMPANY, INC., GRAYDAZE CONTRACTING, INC., SK TILE & PLASTER, LLC, WMK MECHANICAL GROUP, LLC, CAJUN INSTALLATION AND DISTRIBUTING INC., MSI BUILDING SUPPLIES, INC., STEPHEN M. SCHULER d/b/a STEVE SCHULER & SON CONSTRUCTION, ECLECTIC ELECTRIC, INC., R.F. LUSA & SONS SHEETMETAL, INC., KENT SCOTT, KRAUS-MANNING, INC., ATLANTA REFRIDGERATION SERVICE, VI, MAYER ELECTRIC SUPPLY, and SB ARCHITECTS, Additional Counterclaim and Cross-Claim Defendants**

v.

**SB ARCHITECTS, INC., P.W.S. INTERNATIONAL INC., MCM MECHANICAL, RI-TECH CONSTRUCTION, LLC, ISLAND TILE AND MARBLE, LLC, MICHAEL RAISER ASSOCIATES, INC., AUBERGE RESORTS, LLC, PAUL FERRARAS and DONALD BLUMENTHAL, Additional Cross-Claim Defendants**

Civil No. ST-09-CV-535

Superior Court of the Virgin Islands

Division of St. Thomas and St. John

March 30, 2010

SUSAN BRUCH MOOREHEAD, ESQ., NAGESH V. TAMMARA, ESQ., Smock & Moorehead, St. Thomas, USVI, *Attorneys for Plaintiff.*

STEVE HOGROIAN, ESQ., Kotas & Hogroian, P.C., St. John, USVI, *Attorney for Defendant Stone Masonry, Inc.*

GREGORY H. HODGES, ESQ., JUSTIN K. HOLCOMBE, ESQ., Dudley, Topper and Feuerzeig, LLP, St. Thomas, USVI, *Attorneys for Defendant WestLB AG.*

ALEX M. MOSKOWITZ, ESQ., A.J. Weiss & Associates, St. Thomas, USVI, *Attorney for Defendant ASCF International, Inc.*

CARROLL, *Judge*

## MEMORANDUM OPINION

(March 30, 2010)

**THIS MATTER** is before the Court upon Defendant/Counterclaim Plaintiff WestLB AG's Emergency Motion for the Appointment of Receiver, filed on December 2, 2009. The Court initially granted WestLB AG's Motion on December 11, 2009, but then vacated the Order on December 18, 2009. The Court heard testimony from the parties on the Motion on January 12, 22, 29 and 30, 2010. The parties presented oral argument on February 10, 2010. The Court also visited the site at issue in

this matter on January 23, 2010, recording a video of the visit, a copy of which has been filed with the Court. For the reasons stated below, the Court will grant WestLB AG's Motion. The Court will, however, receive additional briefs from the parties regarding the receiver's identity and powers.

## FACTS

Plaintiff First American Development Group/Carib LLC ("First American") brought this action against WestLB AG ("WestLB") for, *inter alia*, breach of contract and breach of fiduciary duty. WestLB counterclaimed for foreclosure and shortly thereafter filed an Emergency Motion for the Appointment of a Receiver pursuant to the terms of the Mortgage between the parties.

First American owns the property at the heart of this dispute, which is located in Chocolate Hole Bay, St. John, U.S. Virgin Islands.[1] Over the last several years, First American has been engaged in developing a luxury private residential community referred to by the parties as the "Pond Bay Club Project" (the "Project"). In order to fund the Project, First American sought and received a loan from WestLB, a German bank, in the amount of Sixty-One Million Six Hundred Thousand Dollars ($61,600,000.00) on March 28, 2007. In addition to WestLB's loan, First American also received an equity contribution from Arcapita, a Bahraini bank not a party to this case, to fund the remaining costs of the Project.[2] In exchange for WestLB's loan, First American delivered a First Priority Mortgage (the "Mortgage") to WestLB, giving WestLB a security interest in, *inter alia*, the property, rents, leases and project permits. The Mortgage and the Loan and Security Agreement ("Loan Agreement") were produced as exhibits during the course of the testimony on the Motion.

---

[1]    The property is described more fully as Parcel Nos. 488D, 488E and 488F Estate Chocolate Hole, No. 11 Cruz Bay Quarter, as shown on PWD No. D9-5075-T91 (Ex. B to Def.'s Emergency Mot.)

[2]    Bob Emmett, the "authorized signatory" of First American, testified that he is also an "authorized representative" of an Arcapita-affiliated entity, but not an officer, director or shareholder of Arcapita. The Preliminary Project Budget, attached to the Loan Agreement as Exhibit M, states that Arcapita was to provide approximately Twenty-Eight Million Seven Hundred Thousand Dollars ($28,700,000.00) to the Project. (Ex. M to Def.'s Ex. A.)

## A. Financing Troubles

Construction began on the Project in early 2008. By early 2009, the Project began to face financing difficulties.[3] On April 1, 2009, Christian Ruehmer ("Ruehmer"), Managing Director of WestLB's Investment Management/Portfolio Exit Group, met with Bob Emmett, an "Authorized Signatory" and "Managing Member" of First American, to discuss the status of the Project. According to Ruehmer, Emmett told him that the Project was ongoing and would be completed in November 2009.[4]

On June 26, 2009, WestLB sent a letter to First American stating the "Loan is not In Balance and if Borrower fails to deposit the Shortfall Deposit with [WestLB] within ten (10) Business Days . . . [WestLB] will be entitled to, among other things, declare an Event of Default." (Defs.' Ex. B, referencing § 2.2(d) of the Loan Agreement.) According to Ruehmer, WestLB sent the letter because there were insufficient funds to complete the Project.[5]

From April 2009 until the end of October 2009, WestLB and First American negotiated possible scenarios in which the Project might be completed despite the financing shortfall. At times these discussions also included representatives from Arcapita, Glass Ratner Advisory & Capital Group LLC ("Glass Ratner") (which Arcapita and First American hired to assist with the restructuring of the Project's budget and to obtain additional financing), and from Alvarez & Marsal ("A&M") (which WestLB's counsel, Sidley Austin LLP, retained to provide financial advice and consulting to WestLB). Some of the proposals advanced by Glass Ratner would have required WestLB to advance Twenty-Five Million Dollars ($25,000,000.00) more than the fully advanced loan. A&M

---

[3]    Christian Ruehmer, Managing Director of WestLB's Investment Management/Portfolio Exit Group, testified that the Project began to look troubled in February to March 2009.

[4]    The loan documents specified that the Completion Date was supposed to be May 15, 2009 (Def.'s Ex. A § 1.1), but Ruehmer testified that Emmett acknowledged the Project would not be completed by that date.

[5]    Ruehmer testified that he did not recall receiving any response to this letter. First American, however, produced a letter dated July 8, 2009, which it says it sent to WestLB in response to the June 26, 2009 letter. (Pl.'s Ex. 5.) First American's July 8, 2009 letter states that WestLB's letter did not constitute "effective notice," that WestLB was "not entitled to declare an Event of Default," and that First American was not "required to provide any Shortfall Deposit."

Managing Director Richard Morawetz ("Morawetz") testified that, after visiting the site in early September 2009, he believed the Project required another Thirty-Five Million Dollars ($35,000,000.00) to complete and could not be finished until at least late spring 2010. First American's project manager, Claude Dupre ("Dupre"), referred to the Project as being "stuck."

First American and WestLB dispute why the negotiations between them were unsuccessful. Morawetz testified that, during the negotiations, First American's management maintained that it had no more money to put into the Project, and that it expected WestLB to provide the funding required to complete it. Ruehmer testified that First American never provided a satisfactory answer regarding where the money to complete the Project would come from. WestLB produced a letter it sent to First American dated July 14, 2009 (Def.'s Ex. C), requesting a revised Project budget.[6] Ruehmer testified that WestLB never received a response to the letter or a revised Project budget. First American, on the other hand, maintains that WestLB did not negotiate in good faith.

Ultimately, the negotiations were unsuccessful. In July 2009, WestLB notified First American that it had "no further obligations to fund the Remaining Loan Proceeds," (Def.'s Ex. C), and on November 12, 2009, WestLB sent First American a "Notice of Default" (Def.'s Ex. F).

## B. Project Slowdown and Cessation of Construction Activities

On September 25, 2009, Defendant Stone Masonry, Inc., filed the first construction lien on the property.[7] Following this development, WestLB advanced a "protective payment" to certain subcontractors in exchange for a commitment that they would continue to work on the Project and withhold filing liens against the property until October 12, 2009. (Def.'s Ex. E.) Ruehmer testified that First American never offered to pay any part of the protective payment.[8] Despite WestLB's payment,

---

[6]   The letter references Loan Agreement § 3.2(j), which states that it is a condition precedent to each advance of loan funds that First American produce evidence that there are sufficient funds to cover all Project costs.

[7]   Stone Masonry's lien was filed in the amount of Two Hundred Thirty-Four Thousand Two Hundred Thirty-Seven Dollars and Thirty Cents ($234,237.30).

[8]   In a September 25, 2009 letter to First American, WestLB states that First American notified it that the Project did not possess sufficient funds to pay the subcontractors' out-

subcontractors began filing liens. Ruehmer testified that the total amount of the liens filed against the property now exceeds at least Seven Million Dollars ($7,000,000.00). While Emmett and Dupre acknowledged that some of that total reflects legitimate amounts due, they contend that they are unable to validate the totals because they require documents held by Wharton-Smith, Inc. ("WSI") that WSI has refused to turn over.

WSI's Vice-President, David Hayes ("Hayes"), testified that he met with Arcapita at the end of August to determine the likelihood that the project would obtain sufficient funding. According to Hayes, Arcapita stated that it was in negotiations with the bank and that funding for the Project would be forthcoming, but that it would not advance any money at that time.

The subcontractor responsible for environmental monitoring, Defendant BioImpact, Inc. ("BioImpact"), stopped work on the site in September 2009. WSI began reducing its work level in August and September and finally left the site on November 9, 2009. The subcontractors decreased and then eventually ceased their participation in the Project. Emmett admitted that construction has been suspended for more than sixty (60) days.[9]

The Project continues to maintain a sales office on site. The sales office is generally open during business hours and, during those hours, staffed by one person, Heather Ruhsam ("Ruhsam").[10] In addition, two Project employees with responsibility for marketing visit the site from time to time. Ruehmer testified that he was aware of the Staff on site and that WestLB had no objection to the continuing operation of the sales office if the Project continued to have something to market. Ruehmer testified that the Project is not collecting any rents at this time.

Through WSI, WestLB arranged and paid for the electrical utilities for the residential units in November and December 2009. WSI's project manager, Jay Wicklund ("Wicklund"), testified that First American never

---

standing balances, and that First American's "constituent members have taken the position that they have no obligation to advance such funds and have elected not to do so." (Def.'s Ex. E.)

[9]    While admitting that construction has ceased for a number of months, Emmett noted that First American disputes the cause of the suspension.

[10]    Ruhsam admitted that her realm is "fairly restricted" and that she generally does not go to the construction part of the site, but rather stays in the area in which die sales office is located.

offered to pay any portion of the utilities. Emmett countered that the bills were late, that the failure to pay was unintentional, and that even Wicklund had to go in person to the Virgin Islands Water and Power Authority ("WAPA") to sort out the bill.

WestLB contacted WSI to arrange and pay for a security service for the Project site beginning on September 22, 2009. That service began with two guards who secured the property when WSI was not on site, but was increased to provide for security coverage twenty-four hours a day, seven days a week, around mid-November 2009. On December 15, 2009, WestLB's security service was asked to leave the premises by a security company paid for by First American. There is some fencing around the Project site to provide security, but the project is not completely fenced in. There are no fences along the beach. In addition, Flemon Lewis of Interscope Security, Inc., the security company hired by First American, admitted that the security guards do not monitor the entrance used by the sales and marketing employees.

On November 12, 2009, WestLB sent a Notice of Default to First American accelerating all amounts due.[11] (Def.'s Ex. F.) On November 13, 2009, it filed an action for foreclosure in the District Court of the Virgin Islands. According to Ruehmer, as of January 22, 2010, First American had not cured or attempted to cure any of the defaults listed in the November 12, 2009 letter.

## C. The CZM Permit

First American holds a Coastal Zone Management ("CZM") permit, a government permit issued by the U.S. Virgin Islands Department of Planning and Natural Resource's Coastal Zone Management Commission, which allows First American to develop the Project and property site. (Def.'s Ex. X.) In its Mortgage document, First American contractually pledged and assigned the permit to WestLB. On September 21, 2009, WestLB applied to the Division of Coastal Zone Management for "Consent to Pledge" the CZM permit. Ruehmer testified that it was WestLB's position that the pledge should have been registered with CZM at the time of the Loan Agreement and that the September 2009

_____

[11] First American contests that it is in Default and, in its Answer to WestLB's Counter-claim, asserts a number of defenses to WestLB's foreclosure counterclaim.

114

application was a mere formality to follow up on a step that should have been taken earlier. Ruehmer testified that the CZM staff recommended approval of the application. However, at a hearing at the end of October 2009, WestLB's application was rejected.

The CZM permit has certain requirements.[12] (Def.'s Ex. X.) However, the companies with which First American contracted to perform the environmental monitoring have stopped working on the site because they have not been paid. BioImpact and the architect, Springline Architects, LLC ("Springline"), sent a letter to the CZM Committee stating that it was ceasing, *inter alia*, turtle monitoring, water quality monitoring and beach nourishment activities. (Def.'s Ex. G.) Wicklund testified that he did not know of anyone else associated with the Project qualified to perform these tasks. Dupre and Emmett testified that the environmental monitoring and protection services have not been provided since October 2009, when BioImpact and Springline stopped working because First American had not paid them. However, Emmett maintained that he has communicated with the Department of Planning and Natural Resources ("DPNR") and that First American is complying with DPNR's instructions, even though DPNR has not issued any written modification of the permit requirements. He stated that First American had not received any notice of non-compliance.

Emmett testified that he has been in discussions with Springline and BioImpact regarding the potential for these entities to contract with First American to provide water quality monitoring, storm water pollution prevention plan services, turtle monitoring, and other services required by the CZM permit. Testifying on January 30, 2009, Emmett stated that he could ask SpringLine to start "next week." He maintained that he would have funds available at that time. He admitted that the CZM permit bond has now been terminated.

---

[12] The permit requires, *inter alia*, that construction be fifty percent (50%) complete within twelve months of the permit's issuance, and must be "continuous until completion." Major Coastal Zone Management Permit No. CZJ-1-07(L) § 5(f). Should the Permittee fail to continuously construct the Project, the permit is rendered null and void unless the Permittee requests an extension in writing and shows good cause for the extension. § 5(f). In addition, the permit states that if the Permittee "abandons, deserts or vacates the premises or discontinues its operation at the premises for a period totaling six (6) consecutive months, the permit will terminate automatically and be rendered null or void." § 5(o). The permit also has a number of requirements relating specifically to erosion prevention and environmental protection. *See* § 6.

Glass Ratner's Managing Director Wayne Weitz ("Weitz") and Emmett testified that the value of the Project is significantly more with the CZM permit than without it. Emmett called the permit the "heart and soul" of the Project's value. He maintained that if the Project was mothballed for a year or more, the permit "would die."

## D. Condition of the Property

The Project is not yet complete.[13] There are a number of unfinished buildings and there are construction materials distributed over the property.[14] Wicklund testified that the Project is only about forty-five percent (45%) complete.

Hayes testified that WSI was unaware of any action taken by First American to maintain the storm water drainage system after BioImpact ceased its inspection and maintenance of the system on October 9, 2009. Dupre testified that he visually inspects the system on a regular basis, but conceded that these actions do not constitute sufficient maintenance to satisfy the conditions of the CZM permit.

WestLB's proposed receiver, Robert Zdenek ("Zdenek"), a self-employed electrician, visited the Project site on December 6, 2009, and January 13, 2010. He testified that if he were appointed receiver, he would take certain actions to protect the property, including closing certain buildings to protect them from moisture, mold, rats and birds. He observed that the drywall, while mold-resistant, is not mold-free. He would cover windows; clean the site; and cover, inventory and store the construction materials. Zdenek, however, admitted that he had no previous experience as a receiver.

Zdenek did take pictures, however, of the Project site on December 5, 2009. (Def.'s Ex. R.) Similarly, the Court recorded a video of portions of its January 23, 2010 site visit. The pictures and the video record reveal a number of items left outside and uncovered, including, *inter alia*, a spa tub, PVC pipes, timber, tires, glass, marble slabs, paint, spackle, iron tubs,

---

[13] Ruhsam stated that the property is still being marketed, however, and that she is still showing models to prospective owners. There have been no new reservations in the last few months.

[14] The finished buildings are air-conditioned while the unfinished buildings have been left open. When the Court visited the site, the air-conditioning systems in the finished buildings were functioning.

tiles, and what Wicklund refers to as "general construction debris." Wicklund testified that some materials have been damaged because of their exposure to the elements. He testified that the lumber has warped, and that the Romanian marble could be stained. In addition, a large mound of garbage was left on the scene for at least six weeks.[15] Wicklund stated that the materials left out could become "missiles" if not secured before hurricane season. In addition, a number of residential buildings are only partially completed. They remain open, in part, to the elements and the environment. Several of the buildings are missing some or all of their ridge caps. Finally, a large retaining wall on the edge of the property has never been backfilled.

First American provided the testimony of an architect and general contractor, Julio U. B. King ("King"), who examined the property for about three hours on January 26, 2010, at First American's request.[16] King did not conduct an environmental assessment, but evaluated the general condition of the property and what would be necessary to maintain the property in good condition for future use. King stated that the property "looked like a general construction site," and provided a report highlighting the concerns he would have should the property be left as it is for the pendency of the foreclosure action. (Pl.'s Ex. 6.) However, King stated that he was told to consider a six-to-eight month timeframe. While he stated that the property did not look neglected or abandoned, he stated he would not have left it in the condition he found it on his site visit. In addition, while he stated in his report that the Project site can remain in its present condition for the next six-to-twelve months, that is only with the assumption that there are not "any major catastrophic events such as floods, hurricanes, heavy winds and rain." (Pl.'s Ex. 6.)

King concluded that some steps should be taken "immediately" in order to protect the property: the marble ought to be stacked in pallets; tiles should be cleaned, consolidated and removed from exposure; buildings should be secured; loose materials should be inventoried and consolidated; lumber ought to be fastened and braced to prevent its warping; land around the buildings needs to be graded to allow for

---

[15] Wicklund stated that the garbage was left by a subcontractor who refused to remove it because of nonpayment of past due invoices.

[16] King stated that he has his Bachelor of Arts Degree in architecture, and that he became a registered architect in 1988. He has been a general contractor since 1987.

drainage and to prevent "ponding" of water; and garbage should be cleaned up to prevent the pieces of refuse from becoming projectiles during a heavy storm. King estimated the cost to complete these steps would be about Ninety-Seven Thousand Five Hundred Dollars ($97,500.00),[17] and that it could be concluded in about three to four weeks. Finally, he added in his report that his study did not "take into consideration any storm water prevention monitoring of the storm runoff to the pond and sea." (PL's Ex. 6.)

King disagreed, however, that the retaining wall needs to be backfilled at this time. He said it was stable and will not be an issue within the next twelve months unless there are heavy rains. He also stated that the missing ridge caps on several buildings are not an issue at this time, but might become a problem over the course of a year and a half to two years. King maintains that the exposed rebars on the property do not constitute a safety concern, since no one is working on the site, and that they are unlikely to significantly rust over the pendency of the litigation. King made further recommendations if the Project does not recommence within six months.[18] He stated that he would secure the openings on the unfinished buildings in order to protect them during the hurricane season. He would also ensure that all the buildings have well-functioning air conditioning units.

First American also offered Dupre's testimony regarding the status of the Project and the condition of the property. Dupre stated that the site is in "very good condition." He also contested Zdenek and Wicklund's commentary regarding the importance of the construction materials and fixtures lying about on the site. Some of the material, he stated, is scrap because it will not be used or because it is already damaged. He stated that he walks the property regularly, and checks the heating, ventilation and air-conditioning ("HVAC") system filters. He said he is also in contact with Interscope regarding the security services. Dupre acknowledged that the condition of the site on the day of his testimony, January 29, 2010, was essentially the same as it was on the day on which the Emergency Motion was filed, which was December 11, 2009.

---

[17] King admitted that his estimate did not include the costs for ensuring compliance with the CZM permit.

[18] Apparently, King is referring to six months from the date he visited the property, which was January 26, 2010.

## E. "Mothballing" the Project

Wicklund testified regarding the steps that would be necessary to stabilize or "mothball" the Project pending foreclosure.[19] He stated that the site needs to be cleaned up; the materials must be salvaged and inventoried; the site must be stabilized with ground cover and with maintenance of the silt fencing; the HVAC system must be maintained; and the buildings must be boarded up to protect against potential storms. Ruehmer testified that the approximate cost to "mothball" the Project would be about One Million Dollars ($1,000,000.00). Ruehmer testified that WestLB is prepared to pay that sum once a receiver is appointed. As noted above, First American's witness, King, testified that the cost to stabilize the site would be around Ninety-Seven Thousand Five Hundred Dollars ($97,500.00), although this amount would address only some of the concerns that Wicklund and Zdenek raised about the condition of the property.

Emmett testified that he is confident he will have the funds to complete the tasks outlined in King's report. He stated that he has a plan to move ahead with environmental monitoring and that he would focus immediately on those "necessary" items highlighted in King's report. However, when later asked if First American had the wherewithal to preserve and maintain the property if the cost were One Million Dollars ($1,000,000.00), Emmett replied that it depended, and that First American does not fund for future costs. He stated that if he had time and documentation, he could show that First American has One Hundred Thousand Dollars ($100,000.00) to cover the costs of King's mothball estimation, or One Million Dollars ($1,000,000.00) to cover the cost of Zdenek's estimation. He maintained that he has resources available to "come in," including a "forty-billion dollar partner," but that funding has not been forthcoming because of fear that the Project will lose its CZM permit.

---

[19] The parties used the phrase "to mothball" in the hearing. Apparently, they both intended to refer to steps that should be taken to preserve the property during the pendency of the action. Ruehmer stated that mothballing "simply means putting [the Project] in a status in which it doesn't deteriorate up until we come to a conclusion of what best to do [sic] that." (Hrg. Tr. 126, Jan. 22, 2010.) The parties disagree, however, as to what needs to be accomplished to complete the mothballing process.

119

Wicklund testified that, as general manager for WSI's contract, he did not see anything to suggest that First American was any longer willing or able to pay project costs, particularly because it has not been paying past due bills. In fact, Dupre testified that First American has been deferring his salary since September 2009. Emmett countered, however, that First American had paid costs of the Project when it still had a good relationship with WestLB. He admitted, however, that First American had not repaid WestLB any of the loan amount that has now come due.

The Project is not currently generating income. Individuals can make a Five Thousand Dollar ($5,000.00) reservation for one of the residential units, but the reservation is fully refundable. Ruhsam stated that there are currently thirty to thirty-four reservations. Since Ruhsam started working in 2008, she said, the Project has not received any new reservations and no contracts have been signed.

### F. Value of the Property

The parties dispute how much the property with its improvements is worth. Morawetz testified that the "as is" value is approximately Seventeen Million Dollars ($17,000,000.00), and that WestLB expects it would lose approximately Forty-Five Million Dollars ($45,000,000.00) in a foreclosure sale.[20] Dupre testified that there is about Twenty-Seven Million Dollars ($27,000,000.00) "in the ground" in hard costs, but neither he nor Emmett provided an estimate of the property's current value. Emmett stated that the value was less than the Sixty-One Million Six Hundred Thousand Dollars ($61,600,000.00) WestLB lent to First American, but attributed the decline in value to the position in which he said WestLB has put First American. He also admitted that since October, First American and Glass Ratner have consistently held the position that the value of the note and security documents was equal to or less than ten to twenty percent of the original value. Weitz testified that he believed WestLB's note is worth only about Eight Million Dollars ($8,000,000.00). However, Weitz emphasized that the value of the security, i.e. the Note,

---

[20]  Ruehmer testified that WestLB ordered a number of appraisals and that the last appraisal, in September 2009, provided an "as is" value of significantly less than the amount of WestLB's loan to First American, although he could not recall the specific value of that appraisal. In another portion of his testimony, he stated that he expected WestLB would lose at least Twenty Million Dollars ($20,000,000.00).

is not necessarily the same as the value of the collateral. He denied having an opinion as to the "as is" value of the property at this time.

## DISCUSSION

### *Standard*

Before determining whether the appointment of a receiver is appropriate under these circumstances, the Court must address what standard applies to such an appointment in the context of a foreclosure action. WestLB contends that the Restatement's standard is binding on the Court through V.I. CODE ANN. tit. 1, § 4 (1995). First American counters that the Court should follow the case law from the District Court of the Virgin Islands, which describes a multi-factor equitable test. Because the Court finds that WestLB is entitled to the appointment of a receiver under either standard, it need not decide here which standard controls in the U.S. Virgin Islands.

## I. Under the Standard Set Forth in the Restatement, WestLB is Entitled to the Appointment of a Receiver.

■ WestLB contends that the Restatements standard controls because the Legislature has provided that "[t]he rules of the common law, as expressed in the restatements of the law approved by the American Law Institute . . . shall be the rules of decision in the courts of the Virgin Islands in cases to which they apply, in the absence of local laws to the contrary." tit. 1, § 4. The RESTATEMENT (THIRD) OF PROPERTY: MORTGAGES § 4.3 addresses a mortgagee's entitlement to the appointment of a receiver. It states in relevant part:

> (b) A mortgagee is entitled to the appointment of a receiver to take possession of the real estate if the mortgagor is in default under the mortgage and the mortgage or other agreement contains either a mortgage on the rents or a provision authorizing appointment of a receiver to take possession and collect rents upon mortgagor default.

RESTATEMENT (THIRD) OF PROPERTY: MORTGAGES § 4.3(b).

■ It is uncontested that the Mortgage contains a provision for the appointment of a receiver. Section 3.8 of the Mortgage states:

> If an Event of Default shall have occurred and be continuing, Mortgagee, to the fullest extent permitted by law and without regard to the

121

value, adequacy or occupancy of the security for the indebtedness and other sums secured hereby, shall be entitled as a matter of right if it so elects, and without prior notice to the Mortgagor, in any action to foreclose Mortgage, to the appointment of a receiver to enter upon and take possession of the Mortgaged Property and to collect all rents, income, and other benefits thereof and apply the same as the court may direct.

MORTGAGE § 3.8. Therefore, under the Restatement's standard, the only question is whether First American is in default under the Mortgage. Default is generally used to describe "a failure to pay a debt when due," but can also mean more generally any "omission or failure to perform a legal or contractual duty." BLACK'S LAW DICTIONARY 480 (9th Ed. 2009).

The Court finds that First American is in default under the Mortgage. Although WestLB alleges a number of events constituting default, the Court need not address all of them, as WestLB is entitled to the appointment of a receiver upon the finding of any default in the Mortgage.

The Mortgage states that the provisions of the Loan Agreement are incorporated into the Mortgage by reference. Mortgage at 1. Therefore, a default under provisions of the Loan Agreement constitutes a default under the terms of the Mortgage. The Loan Agreement defines specific Events of Default.[21] Section 9.1(c) states that it shall be an Event of Default for First American to "fail[]to achieve Substantial Completion and Final Completion with the terms of Section 6.2(f), subject to delays caused by Force Majeure not to exceed ninety (90) days in the aggregate." Loan Agreement § 9.1(c). The terms "Substantial Completion" and "Final Completion" are defined in the Loan Agreement. Loan Agreement § 1.1. "Force Majeure" is also defined in the Loan Agreement. A "Force Majeure" event is:

> any event that causes a delay in the construction of the Improvements and is outside Borrower's and Sponsor's control only to the extent:
>
> . . .

---

[21] Loan Agreement § 9.1 enumerates occurrences which constitute Events of Default, including a catch-all provision at § 9.1(x) ("Failure to Perform") which states, *inter alia*, that the failure of First American to perform under any of the provisions, terms or covenants of the Loan Agreement constitutes an Event of Default, provided that First American does not submit to WestLB within thirty (30) days a plan to cure such a default.

(b)     such event consists of an act of God (such as tornado, flood, hurricane, etc.), fires and other casualties or condemnation; strikes, lockouts or other labor disturbances (not specific to the Project); riots, insurrections or civil unrest; embargoes, shortages or unavailability of materials, supplies, labor, equipment and systems that first arise after the Effective Date, but only to the extent cause by another act, event or condition covered by this *clause (b)*; sabotage, terrorism; vandalism, or a change in Law or any new Law is enacted after the Effective Date (unless Borrower, in the exercise of due diligence and prudent judgment, should have anticipated such enactment).

Loan Agreement § 1.1.

According to Section 9.1 (c), a failure to Substantially Complete the Project according to the terms of Section 6.2(f) constitutes an Event of Default if not excused by a Force Majeure event. Section 6.2(f) requires First American to "achieve Substantial Completion on or prior to the Completion Date." According to Loan Agreement Section 1.1, the Completion Date was May 15, 2009. Ruehmer's uncontroverted testimony established that First American acknowledged it could not complete the Project by that date but expected that the Project would be completed by November 2009. First American does not dispute that the Project has not been substantially completed or finally completed.[22] In fact, Emmett admitted that the Project is not substantially completed in the "construction sense," and Dupre stated that the Project is "stuck." Therefore, the Court finds that the Project has not achieved Substantial Completion or Final Completion by the Project's Completion Date, as those terms are defined in the Loan Agreement.

█ First American alleges that a Force Majeure event has occurred to excuse its failure to satisfy the requirements of Section 6.2(f). It states in its pleadings that the worldwide economic crisis is a Force Majeure event, and that the crisis has prevented First American from obtaining sufficient funding to complete the Project. However, a worldwide economic crisis does not constitute a Force Majeure event under the definition First American agreed to in the Loan Agreement. There has been no act of God,

---

[22]   WSI's Wicklund testified that the project is only about forty-five percent complete at this time.

fire, other casualty or condemnation, strike, lockout, labor disturbance, riot, insurrection or civil unrest. There have been no embargoes, shortages, or unavailability of materials, supplies, labor, equipment or systems caused by another *clause b* event, and there has not been any sabotage, terrorism, vandalism or change in the law. Even if the Court were to take judicial notice of the existence of a worldwide economic and financial crisis, such a crisis would not constitute a Force Majeure event under the terms of the Loan Agreement to which First American agreed. Therefore, the Court does not find that a Force Majeure event has occurred. Because the Project has not reached Substantial Completion, as that term is understood in the loan documents, by the Completion Date, and because no Force Majeure event has occurred to excuse this failure, the Court finds that First American has defaulted under its Mortgage with WestLB. Under the Restatement standard, then, WestLB is entitled to a receiver.

## II. Under the Standard Set Forth in *National Investors,* WestLB is Entitled to the Appointment of a Receiver.

■ First American urges the Court to apply the standard enunciated in *National Investors Pension Insurance v. Bayside Resort Inc.*, Civ. No. 83-162, 1984 U.S. Dist. LEXIS 24701 (D.V.I. 1984), a case from the District Court of the Virgin Islands. The District Court, when it decided *National Investors*, was not sitting as the Appellate Division, and the case is not published. Therefore, *National Investors* is not binding law for the Superior Court. *See, e.g., In re People of the Virgin Islands*, 51 V.I. 374, 389, n.9 (V.I. 2009) (stating that decisions from the Appellate Division of the District Court are binding on the Superior Court). However, the Court cannot easily dismiss Chief Judge Christian's conclusion that the standard enunciated in *National Investors* stated the majority rule at the time. *Id.* at 389. Moreover, Chief Judge Gómez of the District Court of the Virgin Islands adopted Chief Judge Christian's position in a case decided last year. *Mortgage Electronic Registration System, Inc. v. Patock*, 51 V.I. 917 (D.V.I. 2009) (unpublished). *National Investors*, then, serves as persuasive authority for this Court. Therefore, the Court will consider whether WestLB is entitled to the appointment of a receiver under the *National Investors* standard. The Court concludes, for the reasons that follow, that WestLB is entitled to the appointment of a receiver even under the more stringent *National Investors* standard.

124

■ According to the standard adopted in *National Investors*, the Court should consider the following factors in determining whether or not to appoint a receiver in a foreclosure action:

> (1) whether the security is adequate to cover the debt; (2) whether the mortgagor is insolvent; (3) whether the mortgage instrument contains a pledge of rents and profits to the mortgagee; (4) whether waste has been committed; (5) or whether the security is endangered by non-payment of taxes.

*National Investors*, 1984 U.S. Dist. LEXIS 24701, at *6. These factors should be considered along with any contractual provision authorizing a receiver's appointment. *Id.*

## A. The Security Is Not Adequate To Cover First American's Debt to WestLB.

The security in this case is the Project site at Chocolate Hole, St. John, described in the Mortgage, as well as any improvements on and any rents or income from the property. The debt principal is at least Sixty-One Million Six Hundred Thousand Dollars ($61,600,000.00).

WestLB provided some evidence on the question of whether the security is adequate to cover the debt. Morawetz testified that, should the property foreclose in its "as is" condition, WestLB expects to lose around Forty-Five Million Dollars ($45,000,000.00). Although this is a self-serving statement in the context of the Emergency Motion, First American did not provide any evidence to contradict Morawetz's statement.[23] If WestLB would lose Forty-Five Million Dollars ($45,000,000.00) following the sale of the property, then it appears clear that the secured property is insufficient to satisfy the debt.[24] Although First American urges the Court to adopt the *National Investors* standard, it did not provide any evidence regarding the current value of the property, which is one of the factors this Court must consider. Consequently, the Court

---

[23] In fact, Emmett acknowledged that in January 2010, First American had offered to buy WestLB's Note for only Eight Million Dollars ($8,000,000.00).

[24] Since the property is not currently generating any rents or income, the addition of rents and income to the value of the land and its improvements would not change the value of the overall secured property.

finds that the value of the security is insufficient to cover First American's debt to WestLB.

## B. The Court is Unable to Determine Whether First American is Insolvent.

Although First American admits it has not paid a number of debts and costs associated with the Pond Bay Project, the Court does not have sufficient information at this time to determine that First American is *unable* to pay its debts and is, therefore, insolvent. There are certainly indications that First American is insolvent. For example, Emmett admitted that he would have to persuade other investors to finance the continuation of the Project, and he would not state that First American currently has the assets to do so. In addition, the Project manager, Claude Dupre, has had his salary deferred for a number of months. However, the Court does not have a complete profile of First American and cannot definitively conclude whether First American is insolvent.

## C. The Mortgage Instrument Contains a Pledge of Rents and Profits to WestLB.

The Mortgage does contain a pledge of rents and profits to WestLB. On page three (3) of the Mortgage, First American grants to WestLB "all rents, income, inventory, accounts . . . relating to the Mortgaged Property." Therefore, this factor is satisfied in WestLB's favor.

## D. Waste Has Been Committed on the Project Site.

The Court heard a number of witnesses for both parties testify regarding whether waste has been or will be committed on the project site. The Court has received into evidence photographs of the site and has conducted a site visit. After considering all this evidence, the Court finds that waste has been committed in the past and will likely continue in the future should a receiver not be appointed.

The Restatement describes the factors a court should consider when determining what constitutes waste. RESTATEMENT (THIRD) OF PROPERTY: MORTGAGES § 4.6. According to the Restatement, "[w]aste occurs when, without the mortgagee's consent, the mortgagor:

(1) physically changes the real estate. . . in a manner that reduces its value;

126

(2) fails to maintain and repair the real estate in a reasonable manner . . . ;

(3) fails to pay delinquency property taxes or governmental assessments . . . ;

(4) materially fails to comply with covenants in the mortgage respecting the physical care, maintenance, construction, demolition, or insurance against casualty of the real estate or improvements on it; or

(5) retains possession of rents to which the mortgagee has the right of possession under § 4.2.

RESTATEMENT (THIRD) OF PROPERTY: MORTGAGES § 4.6(a). Factors (1), (3) and (5) are inapplicable in this case. The Court, therefore, will consider whether First American has committed waste under section 4.6(a)(2) and (a)(4).

The Court finds that First American has failed to maintain and repair the real estate in a reasonable manner. During the site visit, the Court observed that garbage was lying about the site. Wicklund testified that the garbage had been there for some time.[25] The Court also observed storm water inlets that were either completely covered in dirt and rubble or lacked fabric filters. King testified that buildings were in danger of damage because heavy rains would result in "ponding" of water, as there has been no "grading" of the land around the buildings. The site is not sufficiently secured, as there are portions that are not fenced in and there are no guards that currently monitor the entrance used by the sales and marketing employees. Unfinished buildings have been left open, ostensibly to prevent mold and mildew, but these buildings have been left exposed to heavy rains, insects, birds and other vermin. Expensive materials, including marble, tile and hot tubs, have been left outside, where they are in danger of staining and other damage. Although First American appears to be prepared to contract with environmental monitoring contractors, such monitoring ceased over four months ago, and during this time, First American did not act quickly or effectively to

---

[25] Dupre stated that the garbage has been removed since the site visit. However, the existence of garbage for a number of months before its removal goes to the question of both past waste and likelihood that First American will continue to allow waste to be committed in the future.

ensure the protection of the environment or of the CZM permit. Considering the fact that Emmett admitted that the CZM permit is the "heart and soul" of the Project's value, endangering the CZM permit unquestionably constitutes a failure to repair and maintain the property in a reasonable manner.

It is unconvincing to say, as First American's witnesses did, that these conditions reflect a typical construction site. Wicklund testified that this was unusual for a site on which no active work was taking place, and even King admitted that he would not leave a project in this condition. Construction has not occurred on the site for at least four months. In addition, for the last four months, no one has been performing the environmental protection activities required by the CZM permit. First American must maintain and repair the property in a "reasonable manner" and it is not reasonable to treat property on which all construction has ceased, and will continue to cease for the foreseeable future, as if it were an active construction site.[26] The Court may take judicial notice of the fact that the hurricane season in the Virgin Islands begins in June, and that the materials left out and the residences left open could suffer a great deal of damage if they are not secured before then. In addition, the retaining wall, which lacks backfill, could be affected by heavy rains, and the buildings that lack ridge caps could suffer water damage in a severe storm.

Moreover, First American has materially failed to comply with covenants in the Mortgage relating to the "physical care, maintenance, construction, demolition, or insurance against casualty of the real estate or improvements on it." RESTATEMENT (THIRD) OF PROPERTY: MORTGAGES § 4.6(b)(4). Under the Mortgage and Loan Agreement, First American was required to construct the residences and complete the Project by May 15, 2009. Those improvements have not been completed. In fact, Emmett admitted that even the first "phase" of the Project is only sixty to sixty-five percent (60%-65%) complete. The Court finds that First American materially failed to comply with this covenant of the Mortgage.

Because First American has not maintained and repaired the property in a "reasonable manner" and because it has not materially

---

[26] Dupre admitted that the site is substantially in the same condition as it was when construction ceased.

complied with Mortgage Section 1.4.1(b), requiring completion of the Project by May 15, 2009, the Court finds that waste has been committed on the property.

### E. There is No Evidence Regarding Whether the Property is Endangered by the Nonpayment of Taxes.

Neither party has presented evidence regarding whether the security is endangered by the nonpayment of taxes. Therefore, the Court cannot make a finding regarding this factor.

■ Under the *National Investors* standard, WestLB is entitled to the appointment of a receiver. The Mortgage contains a provision authorizing such an appointment in the event of a default. The property used as security for the loan is insufficient to cover the debt. The Mortgage contains a pledge of rents to WestLB. Waste has been committed, and is likely to be committed in the future. Although the Court cannot make a finding regarding First American's solvency or whether the security is endangered by the nonpayment of taxes, the weight of the evidence on the remaining factors establishes WestLB's equitable right to a receiver to preserve its security.

### III. The Court Will Order The Parties to Brief the Questions of Who Ought to Serve as the Receiver and What Powers the Receiver Should Have.

As discussed above, the Court will grant WestLB's Emergency Motion for the Appointment of a Receiver. Before making the actual appointment, however, the Court will order the parties to brief the question of who ought to serve as a receiver and what powers that receiver should have.

### A. The Court Will Not Approve Robert Zdenek as the Receiver.

WestLB proposed Robert Zdenek to serve as the receiver for the Pond Bay Club Project. In fact, the Court appointed Zdenek as the receiver before vacating that Order. During this Motion's hearing, however, the Court heard testimony from Zdenek. The Court will not approve Zdenek again as the receiver for the Project. Zdenek does not have any experience as a receiver, let alone as a receiver for a large and complex project like the Pond Bay Club Project. The receiver appointed in this matter will be responsible for organizing every aspect of the "mothballing" Project. It appears to the Court that, whatever the powers eventually given to the

receiver, this task requires someone with both the depth and breadth of experience that Zdenek lacks. Therefore, under separate Order, the Court will require First American and WestLB to each propose two (2) persons to serve as the potential receiver, and to accompany these recommendations with the appropriate supporting documents and briefs.

### B. In the Appointment of a Receiver, the Court Will Not Approve Powers as Broad as Those Granted in the December 11, 2009 Order Appointing Receiver.

During oral argument held on February 10, 2010, WestLB's counsel acknowledged in response to the Court's questions that the powers originally requested in WestLB's December 2009 motion were quite broad. Counsel admitted that, should the Court grant WestLB's Motion, the powers given to the receiver could be more limited than those previously proposed. Therefore, the Court will not again grant such extensive powers to the receiver. The Court will direct the parties to brief the issue of what powers the receiver ought to have. The parties are counseled to keep forefront in their minds the intended purpose of the receiver, which is to preserve and maintain the Project site during the pendency of this litigation, to preserve the value of the security, and to ensure that the laws and regulations of the U.S. Virgin Islands are fully complied with. The Court reminds the parties of a fact acknowledged by both WestLB and First American: that the value of the security is significantly higher so long as the CZM permit is maintained.

### CONCLUSION

Under both the Restatement standard and the *National Investors* standard, WestLB is entitled to the appointment of a receiver to take possession of the security at issue in this matter. Therefore, the Court will appoint a receiver to preserve the project for the pendency of this action. Before issuing such an appointment, the Court, under separate order of even date, will require the parties to brief the issue of what powers the receiver ought to have and who ought to serve as the receiver.